**\*\*NOT FOR PUBLICATION\*\***

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| DRAKE PRIMUS, | : | |
| | : | Civil Action No. 15-5671 (CCC) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| WILLIE BONDS, | : | |
| | : | |
| Respondent. | : | |

**CECCHI, DISTRICT JUDGE.**

Before the Court is the Amended Petition for a writ of habeas corpus of Petitioner Drake Primus ("Petitioner"), brought pursuant to 28 U.S.C. § 2254. ECF No. 5. For the reasons set forth below, Petitioner's habeas petition is denied, and Petitioner is denied a certificate of appealability.

## I.       BACKGROUND

The following factual summary is taken from the opinion of the Superior Court of New Jersey, Appellate Division, on direct appeal:

> [Petitioner and his two co-defendants] were all charged in each of the six counts of the indictment with the following offenses: (1) second-degree aggravated assault, N.J.S.A. 2C:12–1b(1) and N.J.S.A. 2C:2–6; (2) first-degree armed robbery, N.J.S.A. 2C:15–1 and N.J.S.A. 2C:2–6; (3) third-degree possession of a weapon (a box cutter knife) for an unlawful purpose, N.J.S.A. 2C:39–4d; (4) fourth-degree unlawful possession of a weapon (a box cutter knife), N.J.S.A. 2C:39–5d; (5) third-degree possession of a weapon (a baseball bat) for an unlawful purpose, N.J.S.A. 2C:39–4d; and (6) fourth-degree unlawful possession of a weapon (a baseball bat), N.J.S.A. 2C:39–5d.
>
> . . .

Primus was found guilty of the offenses charged in Counts One (second-degree aggravated assault), Two (first-degree armed robbery), and Four (fourth-degree unlawful possession of a box cutter knife); Primus was acquitted of Count Three.

. . .

In sentencing Primus, the court merged Count Four with Count Two (first-degree robbery), for which it imposed a term of thirty-five years imprisonment with an eighty-five percent parole disqualifier and five years parole supervision pursuant to NERA. On Count One (second-degree aggravated assault), the court imposed a concurrent nine-year term with an eighty-five percent parole disqualifier and three years parole supervision pursuant to NERA. The sentences were ordered to be served consecutively to a sentence Primus was then serving.

On December 6, 2005, at about 2:00 a.m., the Paterson police received a call advising of a crime in progress at 775 East 19th Street. The information was broadcast by radio, and within one to two minutes, Detectives Jaime Navarro, Carlos Charon, and Felix Arroyo arrived at the intersection of Park Avenue and Madison Avenue, a location near the one described in the dispatch, where they found Zabotinsky. The detectives were in plain clothes and arrived in an unmarked vehicle.

Zabotinsky had parked his pickup truck at an irregular angle and partially on the sidewalk. When the detectives arrived, another man was standing outside the truck. This individual, who was never identified and who left the scene, was trying to get Zabotinsky to calm down. Zabotinsky's throat had been slashed. A deep side-to-side laceration exposed his esophagus. Before the detectives asked Zabotinsky any questions, he stated that he was just robbed and pointed toward 17th Avenue and 19th Street, indicating that was the direction is which his assailants had gone. According to Charon, Zabotinsky said that "three individuals" had robbed him. Navarro, in describing what Zabotinsky said, did not say that he had specified the number of attackers.

Charon described his perception of the circumstances, acknowledging that it was a "very volatile situation," and was "[p]otentially violent." He described it as a crime in progress, and said it raised concerns in the minds of the detectives.

The detectives instructed Zabotinsky to remain at the scene with another officer who had arrived and to wait for medical assistance.

The detectives then left, going in the direction Zabotinsky had indicated, to search for the assailants.

At the same time that the detectives had responded to Zabotinsky's location, Officers Robert Orozco and Jonathan Catrolla were also responding to the initial broadcast of a crime in progress. They were on patrol together and were about ten blocks from the reported location when they heard the dispatch. They were in police uniforms and driving a marked police vehicle. They activated their lights and siren and arrived at Madison Avenue and 17th Avenue within one minute of hearing the dispatch.

About one block from the location where Zabotinsky was found, Orozco and Catrolla encountered three men on 17th Avenue between Madison Avenue and 19th Street. The three were later identified as the three defendants. They were walking away from 19th Street, the area where Zabotinsky was located. They were the only individuals in the area. The officers got out of their vehicle and directed the men to stop. They did not comply, but continued walking toward the officers. Another Officer, Scott Eason, also arrived at the scene within about one minute of the dispatch. He approached Primus from behind and tackled him. Eason searched Primus and found a set of keys in his pants pocket, which was later determined to be Zabotinsky's.

Detectives Navarro, Charon and Arroyo arrived as the defendants were being detained by the other officers. Navarro retraced the route between the arrest location and the location where they had encountered Zabotinsky. He found a blue aluminum baseball bat, later identified as belonging to Zabotinsky. In the street, in front of 781 East 19th Street (very close to the location reported by the caller to the police, namely, 775 East 19th Street), Navarro located a size eleven Vans sneaker, several items of clothing, and an automobile insurance declaration page for Zabotinsky's policy. When the detectives had first encountered Zabotinsky, he was wearing no shoes. At trial, Zabotinsky's father identified the clothing and insurance document as articles belonging to his son. He also said that his son wore size eleven Van sneakers like the one recovered at the scene.

Defendants were transported to police headquarters and processed. No money or evidence was found on Manigo or Dix. However, Primus' sweater was stained with blood. DNA testing revealed that the blood on Primus' sweater was Zabotinsky's. After the three defendants were detained, Zabotinsky drove his pickup truck approximately one block to their location. He identified them as his

3

> assailants.  This occurred about twelve to fourteen minutes after the
> attack.  In the course of that encounter, Zabotinsky made other
> statements regarding the attack on him.
>
> Zabotinsky was then transported to the hospital in an ambulance.
> While in the ambulance, Charon briefly interviewed Zabotinsky,
> and received further information from him about the incident while
> medical treatment was being administered.  Subsequently,
> Zabotinsky gave a formal statement to the police.
>
> At trial, none of the defendants testified or called any witnesses.

ECF No. 12-15 at 3–5, 9–12.

Petitioner appealed his conviction and sentence, and the Appellate Division affirmed on August 1, 2011. ECF No. 12-15.  The New Jersey Supreme Court denied certification on January 13, 2012. ECF No. 12-22.  Petitioner filed a petition for post-conviction relief ("PCR"), which was denied on March 14, 2013. ECF No. 12-13 at 12–20.  Petitioner appealed the denial of PCR and the Appellate Division affirmed on December 12, 2014. ECF No. 12-24.  The New Jersey Supreme Court denied certification on April 30, 2015. ECF No. 12-29.  Petitioner then filed a habeas petition with this Court, which he executed on July 13, 2015. ECF No. 1.  The Court administratively terminated the case and Petitioner filed an Amended Petition, executed on January 4, 2016, in which he raises four grounds for relief:

1. Trial counsel was ineffective for not filing the pre-trial suppression motion challenging the Paterson Police for tampering with the evidence, specifically, money taken from petitioner upon arrest.

2. Trial and appellate counsel were ineffective for not objecting to the prosecution's failure to dismiss the aggravated assault [charge] against petitioner, based upon co-defendant ultimately being charged for this specific crime by the State.

3. Trial and appellate counsel were ineffective for not challenging the trial judge's finding of aggravating factors and petitioner's juvenile record to impose an extended term sentence, violating petitioner's [S]ixth [A]mendment right to trial by jury, also petitioner[']s Fourteenth [A]mendment of Due Process [rights].

4. Trial and appellate counsel were ineffective for not challenging the prosecutor's abuse of discretion, violating *Brady v. Maryland*, also the trial court [decision] was contrary to, and applied an unreasonable application to clearly established law concerning *Brady v. Maryland*, violating petitioner's Due Process [rights].

ECF No. 5.

 Respondents filed an Answer in which they argue that all four of Petitioner's claims are unexhausted and lack merit. ECF No. 15-1.[1]

## II.    LEGAL STANDARD

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition. *See Harrington v. Richter*, 562 U.S. 86, 98 (2011); *Price v. Vincent*, 538 U.S. 634, 641 (2003).  District courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 773 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless the state court adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States

---

[1] The Court has received and reviewed additional letter submissions from Petitioner. ECF Nos. 16–26.

5

Supreme Court. *See Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

In addition to the above requirements, a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To do so, a petitioner must "'fairly present' all federal claims to the highest state court before bringing them in federal court." *Leyva v. Williams*, 504 F.3d 357, 365 (3d Cir. 2007) (citing *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 369 (3d Cir. 2002)). This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'" *Id.* (citing *United States v. Bendolph*, 409 F.3d 155, 173 (3d Cir. 2005) (quoting *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)). To the extent that a petitioner's constitutional claims are unexhausted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005).

## III.   DISCUSSION

Petitioner raises four claims of ineffective assistance of counsel, all of which lack merit. The Sixth Amendment guarantees the accused the "right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal

6

assistance. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984).   A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied. *Id.* at 687.   First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687–88.   To meet this prong, a "convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690.   The court must then determine whether, in light of all the circumstances at the time, the identified errors fell "below an objective standard of reasonableness." *Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014).

Second, a petitioner must establish that counsel's "deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *Strickland*, 466 U.S. at 669.   To establish prejudice, the defendant must show that "there is a reasonable probability that the result of trial would have been different absent the deficient act or omission." *Id*. at 1083.   On habeas review, it is not enough that a federal judge would have found counsel ineffective.   The judge must find that the state court's resolution of the issue was unreasonable, a higher standard.   *Harrington v. Richter,* 562 U.S. 86, 101 (2011).

### A.  Pre-trial Motion

In his first ground, Petitioner argues that his trial counsel erred in failing to file a pre-trial motion challenging the conduct of the Paterson Police Department, which he argues tampered with evidence. ECF No. 5 at 7.   In Petitioner's Amended Memorandum in support of his habeas claims (ECF No. 13), he explains that upon his arrest, $71.00 was taken from him and tagged by the arresting officers as evidence.   Subsequently, he states that the officers gave $60.00 of that money to the victim.   He explains that the decision to hand over evidence to the victim was improper and

his counsel's failure to challenge the infraction violated his constitutional rights.   Respondents argue the claim is unexhausted.  A review of the record, however, demonstrates that the claim was raised, to some degree, below. *See* ECF Nos. 12-26 at 38; 12-25 at 25; 12-28 at 13.  To the extent this claim is not fully exhausted, it is dismissed on the merits under 28 U.S.C. § 2254(b)(2) for the reasons discussed below.

The Appellate Division, in affirming the denial of PCR, denied the claim, explaining:

> The governing law is well established.  The Sixth Amendment of the United States Constitution guarantees a person accused of crime the effective assistance of legal counsel in his defense*. Strickland v. Washington*, 466 U.S. 668, 685–88, 104 S. Ct. 2052, 2063–64, 80 L. Ed. 2d 674, 692–93 (1984).  To establish a deprivation of that right, a convicted defendant must satisfy the two-part test enunciated in *Strickland* by demonstrating that: (1) counsel's performance was deficient, and (2) the deficient performance actually prejudiced the accused's defense. *Id.* at 687, 104 S. Ct. at 2064, 80 L. Ed. 2d at 693; *see also State v. Fritz*, 105 N.J. 42, 58 (1987) (adopting the *Strickland* two-part test in New Jersey).

> In reviewing such claims of ineffectiveness, courts apply a strong presumption that defense counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland, supra*, 466 U.S. at 690, 104 S. Ct. at 2066, 80 L. Ed. 2d at 695. "The quality of counsel's performance cannot be fairly assessed by focusing on a handful of issues while ignoring the totality of counsel's performance in the context of the State's evidence of defendant's guilt." *State v. Castagna*, 187 N.J. 293, 314 (2006) (citing *State v. Marshall*, 123 N.J. 1, 165 (1991), *cert. denied*, 507 U.S. 929, 113 S. Ct. 1306, 122 L. Ed .2d 694 (1993)).

> "As a general rule, strategic miscalculations or trial mistakes are insufficient to warrant reversal 'except in those rare instances where they are of such magnitude as to thwart the fundamental guarantee of [a] fair trial.'" *Id.* at 314–15 (quoting *State v. Buonadonna*, 122 N.J. 22, 42 (1991)). "'[A]n otherwise valid conviction will not be overturned merely because the defendant is dissatisfied with his or her counsel's exercise of judgment during the trial.'" *State v. Allegro*, 193 N.J. 352, 367 (2008) (quoting *Castagna, supra*, 187 N.J. at 314).

> As Judge Reddin correctly recognized, this case is not a "rare instance" in which the presumption of trial counsel's effectiveness has been overcome.   The proofs against Primus and his co-defendants were exceedingly strong, and his criticisms of his attorney's performance are without merit.
>
> . . .
>
> The ineffectiveness claims based upon trial counsel's alleged and unspecified lack of adequate investigation, and counsel's failure to file a motion to suppress, is based upon sheer speculation that such efforts would have been fruitful.  As Judge Reddin rightly observed, the proofs of guilt here were "overwhelming."

ECF No. 12-24 at 3–6.

Judge Reddin, in denying Petitioner's application for PCR, during the PCR hearing, explained:

> The victim, as [the State] said, was horrifically attacked, savagely attacked, cut from ear to ear with a box cutter.  Think about the horror associated with that.   And although he probably bled profusely, a small amount of his blood ended up on one of the defendant's clothing.
>
> His bat, which is a unique item, later identified by his father, was nearby where the defendants were arrested.  The victim's keys were found and this was all in close proximity to the location of the crime.
>
> And the victim indicated that the three males that assaulted him -- he gave the description.  And the assailants who were arrested, the defendant in this case, matched the description.  So the evidence was overwhelming.

ECF No. 12-13 at 13.

The Appellate Division's application of *Strickland* to the facts of this case is not unreasonable.  First, while the trial transcript indicates that money was found on Petitioner (ECF No. 12-8 at 24), it does not reflect that any portion of that money was turned over to the victim. Attached to Petitioner's Amended Memorandum, however, is an unspecified document which Petitioner claims is a detective's supplemental notes, that states in relevant part: "[t]he victim was

given $60.00 in cash from the amount recovered from Mr. Primus.  The additional $11.00 was tagged under property tag #31365." ECF No. 13 at 21.  Even assuming the supplemental notes are accurate and the victim was given $60, Petitioner has still failed to demonstrate how returning $60 to the victim prejudiced him, as required under the second prong of *Strickland*.  As noted by the state courts and verified by the record, there was substantial evidence linking Petitioner to the crime.  While the victim had since passed away and was unable to testify, one officer testified that he recovered the victim's keys on Petitioner (ECF No. 12-6 at 37; ECF No. 12-8 at 8), the victim's blood was found on Petitioner's clothing (ECF No. 12-7 at 57), and various items from the victim, such as his shoes and clothing, were found scattered on the street near where Petitioner and the other defendants were apprehended. ECF No. 12-8 at 11–13.  Petitioner has, therefore, failed to demonstrate that absent the alleged misconduct in returning the money to the victim, it is reasonably probable that the outcome of the case would have been different.  Thus, the state court's rejection of this claim was not an unreasonable application of clearly established Supreme Court law.[2]

---

[2] Petitioner's papers can also be construed to make an additional claim in which he appears to argue that his search and arrest without a warrant violated his constitutional rights. ECF No. 13 at 9.  To the extent Petitioner is claiming that it was unlawful for the officers to search him, this falls within one of the well-delineated exceptions to the warrant requirement—namely, a search incident to a lawful arrest based on probable cause, and his claim is therefore denied as it is without merit. *See Arizona v. Gant*, 556 U.S. 332, 338, (2009). Insofar as Petitioner is instead asserting that the charging officer should have issued him a complaint warrant rather than a complaint summons when initially charging him with his weapons charge, Petitioner was in no way prejudiced.  Petitioner was charged in the same instance with aggravated assault on a complaint warrant and was ultimately indicted for his crimes, and any issue concerning the weapons charge initial complaint summons serves as no basis for habeas relief. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

### B.  Ground Two: Failure to Dismiss Aggravated Assault Charge

In Petitioner's next ground for relief, he argues in the heading that his trial and appellate counsel erred in failing to have his aggravated assault charge dismissed based upon his co-defendants' being charged with the same crime. ECF No. 13 at 10.  However, in his facts supporting this claim, he makes two entirely different arguments.  First, he argues that the court failed to give a proper instruction on accomplice liability, and second, he argues that his rights under the Confrontation Clause were violated based on the Supreme Court holding in *Crawford v. Washington*, 541 U.S. 36 (2004). ECF No. 13 at 10–11.  The Court will address all three arguments.

On the first point, Petitioner's claim is unexhausted.  Putting that aside, Petitioner has provided no facts or argument to support his claim that because his co-defendants were charged with third-degree aggravated assault, he is therefore innocent of his second-degree aggravated assault conviction.  As noted earlier in the Opinion, the record demonstrates that all three individuals were found near the crime scene within minutes of the attack on the victim, and Petitioner was found with the victim's blood on his clothing and the victim's keys in his pocket. Because the victim had since passed away and was unable to testify, and the majority of the victim's statements to the police were not admitted into evidence, it was impossible for the jury to determine who in fact cut the victim's throat.  Thus, the thrust of the State's case came down to accomplice liability.  New Jersey law provides that an individual can be found liable for the conduct of another when he is complicit in the offense.  *See* N.J. Stat. Ann. § 2C:2-6.  Here, it was certainly possible for the jury to convict all three defendants of aggravated assault.  The Court is, therefore, satisfied that trial counsel was not deficient under *Strickland* and counsel's performance did not fall below an objective standard of reasonableness in failing to move for dismissal of the aggravated assault charge.

11

Petitioner also takes issue with the jury instruction on accomplice liability.  Petitioner raised this claim on direct appeal, and the Appellate Division rejected the claim, explaining:

> Primus argues that the accomplice liability instruction was inadequate.  The argument primarily focuses on the judge's failure to closely follow the structure and language of the model jury charge.  In doing so, Primus contends that the judge omitted portions of the model charge (1) instructing that an accomplice and the principal may be found equally responsible or responsible to a lesser degree, (2) requiring that for a defendant to be found guilty for another's conduct he must be found to have acted as the principal's accomplice and also to have had the purpose to commit the specific crime alleged, (3) requiring the State to establish that the defendant solicited, aided, or agreed to aid or attempted to aid in planning or committing the alleged crime, (4) requiring the State to prove that the defendant possessed the criminal state of mind that is required to be proved against the person who actually committed the act, and (5) directing the jury to either find guilt of the charge or move on to consideration of lesser included offenses.
>
> None of the defendants objected to the charge as given, and we are accordingly guided by the plain error standard, which we have previously described.  Our review of the entire accomplice liability charge satisfies us that the judge correctly and adequately explained all of the principles of accomplice liability, although not following the precise format set forth in the model charge.
>
> Our conclusion is bolstered by the jury verdict.  The jurors did not find all three defendants guilty of the same offenses.  While finding Primus (who had Zabotinsky's keys in his pocket and Zabotinsky's blood on his sweater) guilty of the charged offenses of first-degree armed robbery and second-degree aggravated assault, they found Manigo and Dix not guilty of those offenses but guilty of lesser-included offenses.  It is clear that the jurors understood that they could assess differing degrees of culpability among the participants in the crime, and they did so.

ECF No. 12-15 at 44–46.

A jury charge, even if inconsistent with state law, does not automatically warrant federal habeas relief.  "[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 71–72 (1991).  Instead a federal court must

assess "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* at 72 (internal citation and quotations omitted). A habeas petitioner must establish that the instructional error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). The Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law." *Smith v. Horn*, 120 F.3d 400, 416 (3d Cir. 1997).

Petitioner points to minor differences between the recommended model instructions and the charge given. However, this challenge alone is insufficient to grant Petitioner habeas relief. *See, e.g.*, *Hackett v. Price*, 381 F.3d 281, 314 (3d Cir. 2004) (a change reflected in model instructions "does not in itself indicate that its former instructions . . . were constitutionally infirm"); *Berrisford v. Wood*, 826 F.2d 747, 754 (8th Cir. 1987) ("Though the instructions [given] differ[ed] to some degree from suggested pattern instructions used in [the State], the errors therein, if any, clearly do not rise to the level of constitutional significance."). Instead, the record indicates that the trial court properly instructed the jury on accomplice liability, delineating the elements and instructing the Jury that the burden of proof rests with the State, and explaining that an accomplice may possess a different criminal state of mind than other defendants involved in the crime. ECF No. 12-11 at 28–32. Thus, because the trial court did not lift the burden of proof on an essential element of the offense charged, Petitioner has failed to show that he is entitled to relief on this claim.

Petitioner also alleges that his rights under the Confrontation Clause were violated when the judge ruled that certain statements made by the victim could be admitted into evidence, despite the victim being unavailable to testify at trial. Petitioner raised this claim on direct appeal, and the

13

Appellate Division rejected the claim, laying out the relevant background and providing thorough

analysis:

> All three defendants argue that the judge erred in admitting the statement Zabotinsky made when the detectives first arrived at the scene. They argue that the statement was not properly found to constitute an excited utterance, as a result of which it should not have been admitted as an exception to the hearsay rule. They further argue that the statement was testimonial, as a result of which its admission was precluded under the Confrontation Clause.
>
> . . .
>
> At the December 21, 2007 Rule 104(a) hearing, Judge Marmo considered the four statements made by Zabotinsky. He ruled that the last three (the show-up identification at the scene, the ambulance interview, and the formal statement) were inadmissible, and those statements are not a subject of this appeal. The disputed issue pertains only to Zabotinsky's statement to the detectives when they first arrived, stating that he was robbed and that the perpetrators went in a particular direction. And, one of the detectives testified at trial (although not at the Rule 104(a) hearing) that Zabotinsky quantified the number of perpetrators as three.
>
> [Detective] Charon was the only witness at the hearing. He testified that he and [Detective] Navarro arrived in the same vehicle, and [Detective] Arroyo arrived in a separate vehicle. He described the manner in which Zabotinsky's truck was parked as we have previously described it. He said when he first encountered Zabotinsky he was "shaken up," "nervous," and had a slash on his throat from one side of his neck to the other. When Zabotinsky lifted his head, Charon could see that the cut was deep and that part of his esophagus and neck tissue were exposed. He said Zabotinsky was "nervous and frantic," but doubted that Zabotinsky appreciated the extent of his injury. Charon said he told Zabotinsky to keep his head down and that he tried to calm him down.
>
> When asked about the exact conversation he had with Zabotinsky, Charon read from his report: "[Zabotinsky] immediately uttered that he had just been robbed and that the suspects fled down East 19th Street towards 17th Avenue. At that time we noticed the blood around his neck area. I instructed him to remain there until we checked the area [for] the suspects." Charon further testified that Zabotinsky made the statement before Charon or any of the other detectives said anything to him. About three to four minutes had

14

elapsed between the dispatch and the detectives' initial encounter with Zabotinsky.

Charon said that the detectives had their badges showing, but they "didn't even get to say that [they] were police officers when he advised [them] that he had just been robbed."

Based upon that testimony, Judge Marmo found that Zabotinsky's statement was admissible. He set forth his reasons as follows:

> Now taking that body of law and applying it to what we have here, let me say that I have nothing before me to contradict the testimony of Detective Charon with regard to the time lines he's given us and to the condition of the victim upon his arrival. And from that I can readily find as a fact that he arrived in the presence of the victim almost immediately after this incident occurred, because the dispatch is that the robbery is in progress.

> And when he arrives the statement that is made by the victim is not even in response to a question. Certainly this person has had their throat slashed from side to side, they're excited, shaken up as he said, nervous as you can imagine. This is minutes after this incident happened. And without being [in] response to any statement put to him, the uncontradicted testimony is that [Zabotinsky] tells him that he was just robbed and the suspects fled toward East 19th [Street] and 17th [Avenue].

> Now because this is such a critical ruling for the parties, although I'm frankly comfortable with how I've drawn the line here and where I've struck the balance, I'm satisfied that this is admissible—this is not testimonial, this was not made looking towards a future prosecution. This was made for the purposes of reporting just what happened and telling the police what—giving the police information as to what they are dealing with. In any event this is a judgment as to this particular area. So I find that to be admissible.

Defendants argue that because the police arrived three to four minutes after the incident occurred, there was a sufficient lapse of time to enable Zabotinsky to deliberate and fabricate in crafting the statement. They contend that Zabotinsky was no longer under the

stress of the event because (1) he was subsequently able to drive his truck to the location where the defendants were detained for purposes of making an identification, and (2) he was able to provide a statement at police headquarters later that night which omitted information he previously gave that he was in the area to buy drugs with two other individuals.

. . .

We turn now to the . . . *Confrontation Clause* issue. Our resolution of this issue requires a determination of whether Judge Marmo erred in finding that the statement was not testimonial. Part of that analysis requires consideration of whether the statement was made during an ongoing emergency. This trial was conducted before the United State Supreme Court's recent decision in *Michigan v. Bryant*, 562 U.S. [344], 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011), a case with facts very similar to these, in which the Court provided significant guidance regarding the admissibility of statements such as that made by Zabotinsky.

We begin by summarizing the development over the last several years of Confrontation Clause jurisprudence. Even if a statement falls within a recognized exception to the hearsay rule, it still must satisfy the Confrontation Clause. *Branch*, *supra*, 182 N.J . at 369–70 ("*Crawford [v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed.2d 177 (2004)] is a reminder that even firmly established exceptions to the hearsay rule must bow to the right of confrontation."). The Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution guarantee a criminal defendant the right to confront witnesses against him. U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10. The right to confrontation is essential to a fair trial; it requires a defendant to have a "'fair opportunity to defend against the State['s] accusations.'" *Branch*, *supra*, 182 N.J. at 348 (quoting *State v. Garron*, 177 N.J. 147, 169 (2003), *cert. denied*, 540 U.S. 1160, 124 S. Ct. 1169, 157 L. Ed. 2d 1204 (2004)). The right of confrontation is exercised through cross-examination, the "'greatest legal engine ever invented for the discovery of truth.'" *Ibid.* (quoting *California v. Green*, 399 U.S. 149, 158, 90 S. Ct. 1930, 1935, 26 L. Ed. 2d 489, 497 (1970)).

However, "the Confrontation Clause does not condemn all hearsay." *Id.* at 349 (citing *Crawford v. Washington*, 541 U.S. 36, 51, 124 S. Ct. 1354, 1364, 158 L. Ed. 2d 177, 192 (2004)). "An established and recognized exception to the hearsay rule will not necessarily run afoul of the Confrontation Clause. A defendant's confrontation

right must accommodate legitimate interests in the criminal trial process, such as established rules of evidence and procedure designed to ensure the efficiency, fairness, and reliability of criminal trials." *Ibid.* (quotations and citations omitted).

In *Crawford v. Washington*, *supra*, the United States Supreme Court held that the Confrontation Clause is violated by admitting an absent witness's testimonial statement unless the witness was unavailable to testify and the defendant had a prior opportunity to cross-examine the witness. 541 U.S. at 54, 124 S. Ct. at 1365–66, 158 L. Ed. 2d at 194. In *Davis v. Washington*, the Court clarified what constitutes a testimonial statement. 547 U.S. 813, 822, 126 S. Ct. 2266, 2273–74, 165 L. Ed. 2d 224, 237 (2006).

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

[*Ibid.*]

The *Davis* Court's application of this standard is informative. In *Davis*, a 911 emergency operator spoke telephonically with a woman who was in the midst of an ongoing domestic disturbance with her former boyfriend. *Id.* at 817, 126 S. Ct. at 2271, 165 L. Ed. 2d at 234. The operator asked the woman questions about events as they were happening; the woman was not describing past events, and was not responding to questions during an interrogation that took place hours after the events had occurred. *Id.* at 827, 126 S. Ct. at 2276, 165 L. Ed. 2d at 240. The court found that any reasonable listener would have recognized that the woman was facing an ongoing emergency; of note, during the conversation, the woman told the operator that her former boyfriend ran out and left with someone in a car. *Id.* at 818, 827, 126 S. Ct. at 2271, 2276, 165 L. Ed. 2d at 234, 240.

The Court found that the statements were made to the operator to resolve the present emergency, not to detail past events. *Id.* at 827, 126 S. Ct. at 2276, 165 L. Ed. 2d at 240. Specifically, the operator made efforts to "establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering

17

a violent felon." *Ibid*. Thus, the statements had the "primary purpose" of enabling police to "meet an ongoing emergency." *Id.* at 828, 126 S. Ct. at 2277, 165 L. Ed. 2d at 240. The Court determined the woman's statements to the emergency operator, at least up to the time the former boyfriend fled from the house and left in a car, were not testimonial. *Id.* at 829, 126 S. Ct. at 2277, 165 L. Ed. 2d at 241.

New Jersey courts recognize and follow *Crawford* and *Davis* when addressing hearsay statements and the Confrontation Clause. *See State v. Buda*, 195 N.J. 278, 299–308 (2008); *State ex rel. J.A.*, 195 N.J. 324, 341–51 (2008).

Most recently, the United States Supreme Court addressed the issue of testimonial statements and ongoing emergencies again, this time in the context of a case in which officers responded to a radio dispatch that a man had been shot. *Michigan v. Bryant*, *supra*, 562 U.S. at [348], 131 S. Ct. at 1150, 179 L. Ed. 2d at 102. Officers found the victim lying on the ground next to his car in a gas station parking lot. *Ibid*. The officers asked the victim what happened, who shot him, and where the shooting occurred, to which the victim responded that "Rick" had shot him. *Ibid*. The victim told officers that he spoke with the defendant through the closed back door of the defendant's home, and when the victim turned to leave, he was shot through the door; he then drove to the gas station. *Ibid*. Thereafter, emergency medical services arrived and transported the victim to a hospital, where he died a few hours later. *Ibid*.

The *Bryant* Court noted that this case required the Court to provide additional clarification about what *Davis* meant by "'the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.'" *Id.* at [345], 131 S. Ct. at 1156, 179 L. Ed. 2d at 108 (quoting *Davis*, *supra*, 547 U.S. at 822, 126 S. Ct. at 2273, 165 L. Ed. 2d at 237). The Court described the analysis as follows:

> As we suggested in *Davis*, when a court must determine whether the Confrontation Clause bars the admission of a statement at trial, it should determine the "primary purpose of the interrogation" by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs. *The existence of an emergency or the parties' perception that an emergency is ongoing is among the most important circumstances that courts must take into account in determining whether an interrogation is*

18

> *testimonial because statements made to assist police in addressing an ongoing emergency presumably lack the testimonial purpose that would subject them to the requirement of confrontation.  As the context of this case brings into sharp relief, the existence and duration of an emergency depend on the type and scope of danger posed to the victim, the police, and the public.*

[*Id.* at [370–71], 131 S. Ct. at 1162, 179 L. Ed. 2d at 114–15 (emphasis in App. Div. decision and footnote omitted).]

Applying that analysis to the facts, the [*Bryant*] Court stated:

> For their part, the police responded to a call that a man had been shot.  As discussed above, they did not know why, where, or when the shooting had occurred.  Nor did they know the location of the shooter or anything else about the circumstances in which the crime occurred.  The questions they asked . . . were the exact type of questions necessary to allow the police to "'assess the situation, the threat to their own safety, and possible danger to the potential victim'" and to the public, *Davis*, 547 U.S., at 832, 126 S. Ct. 2266, 159 L. Ed. 2d 224 (quoting *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U.S. 177, 186, 124 S. Ct. 2451, 159 L. Ed. 2d 292 (2004)), including to allow them to ascertain "whether they would be encountering a violent felon," *Davis*, 547 U.S. at 827, 126 S. Ct. 2266, 165 L. Ed. 2d 224.  In other words, they solicited the information necessary to enable them "to meet an ongoing emergency."  *Id.*, at 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224.

[*Bryant, supra*, 562 U.S. at [375–76], 131 S. Ct. at 1165–66, 179 L. Ed. 2d at 118–19 (footnotes omitted).]

Accordingly, the Court held that the victim's identification and description of the shooter and the location of the shooting were not testimonial hearsay, and thus not barred at trial by the Confrontation Clause.  *Id.* at 377–78], 131 S. Ct. at 1166–67, 179 L. Ed. 2d at 119.

The case before us is very similar to *Bryant*.  The detectives responded to Zabotinsky's location in response to a dispatch that advised of a crime in progress.  As in *Bryant*, the detectives did not

19

know why or how Zabotinsky's throat had been slashed, by whom, where the assailant or assailants were, or the specific location where the crime had occurred.   The situation was aptly described as "volatile."   Zabotinsky's statement was made spontaneously and voluntarily, not in response to police interrogation.   As in *Bryant*, the information the detectives received from Zabotinsky enabled them to respond to an ongoing emergency, in which they might seek out and find armed attackers that had just committed a violent crime.

The information received was not solicited for future prosecution, it came as part of the initial contact between police and a victim, immediately following a violent crime, and prior to the apprehension of potentially violent criminals.   Once the detectives learned this information from Zabotinsky, they left him at the scene with another officer and went in pursuit of his attackers.

Further, unlike in *Bryant*, there is no need for us to ascertain the "primary" purpose of police interrogation that elicited the disputed statement.   This is because there was no interrogation at all. Defendants hypothesize that had Zabotinsky not spoken first, the detectives surely would have asked him what happened.   Therefore, defendants suggest that the circumstances were tantamount to police questioning, similar to what occurred in *Bryant*.   Even if that is so, the result is the same.   The only purpose was not to memorialize past events for purposes of a future prosecution, but to deal effectively and sensibly with an ongoing emergency in the immediate aftermath of a violent crime.

Accordingly, we agree with Judge Marmo that Zabotinsky's statement when first encountered by detectives at the scene was not testimonial, and its admission in evidence did not violate defendants' Confrontation Clause rights.

ECF No. 12-15 at 12–27.

This Court finds that the well-reasoned decision of the Appellate Division on this matter was neither contrary to, nor an unreasonable application of, Supreme Court precedent laid out in *Crawford* and its progeny.   In *Crawford*, the Supreme Court declined to give a comprehensive definition of the term "testimonial," but did provide examples of testimonial statements. 541 U.S. at 51–52, 68.   Subsequently in *Davis*, the Supreme Court provided further clarification of what constitutes a testimonial statement made to police, clarifying that where "the primary purpose of

the [police] interrogation is to enable police assistance to meet an ongoing emergency" the statement is non-testimonial. 547 U.S. at 822. Thus, a court must consider whether the statements were made with a future criminal prosecution in mind. *See Crawford*, 541 U.S. at 51 (holding that an example of a testimonial statement is one that "declarants would reasonably expect to be used prosecutorially").

Here, it is evident that the victim's statements were not testimonial. The record shows that the victim's initial statements to the police were unprompted, made while the victim was still under great distress and in shock after having had his throat cut. ECF No. 12-1 at 11. Detective Charon read the victim's limited statement during the hearing: "Mr. Z[abotinsky] immediately uttered that he had just been robbed and that the suspects fled down East 19th Street towards 17th Avenue." *Id*. at 15. Given these circumstances, it cannot be argued that these statements were made with an eye toward future criminal prosecution, and, therefore, the Confrontation Clause is not implicated. Similar to *Bryant*, where the Supreme Court found that the statements of a mortally wounded victim identifying defendant to police officers were not testimonial, the same is true here. 562 U.S. 360. Because the state court's rejection of Petitioner's Confrontation Clause claim was not an unreasonable application of Supreme Court precedent, the Court denies relief on this claim.

**C. Ground Three: Extended Sentence**

Petitioner next argues that his trial and appellate counsel were ineffective in failing to challenge his extended sentence of thirty-five years, when the facts underlying the increased sentence were never decided upon by the jury. Petitioner relies on *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and similar cases, for the proposition that the extended sentence violated his constitutional rights. Petitioner raised this as a direct claim below, but failed to raise it in the

context of ineffective assistance of counsel.  To the extent the claim is unexhausted, the Court finds the claim meritless.

As an initial matter, the record reveals that counsel did object to Petitioner receiving an extended term sentence.  During the hearing on the State's motion for an extended term, counsel argued that the substantial penalties associated with convictions of aggravated assault and robbery should be enough for the court to deny an extended term. ECF No. 12-12 at 9.  During that hearing, the judge found that Petitioner was eligible for an extended term sentence pursuant to N.J. Stat. Ann. § 2C:44-3(a) as a persistent offender, as he had two prior convictions within ten years of the date of the crime for which he was sentenced. *See* ECF No. 12-12 at 16.  A copy of Petitioner's court history verifies that he was convicted of numerous offenses as an adult prior to the offense committed here. *See* ECF No. 12-14 at 10–13.  Thus, under N.J. Stat. Ann. § 2C:43-7(a)(2), Petitioner was eligible for an extended sentence of 20 years to life imprisonment, on his first degree robbery conviction.  The statute reads:

> [A] person who has been convicted of a crime shall be sentenced, to an extended term of imprisonment, as follows . . . [e]xcept for the crime of murder . . . in the case of a crime of the first degree, for a specific term of years which shall be fixed by the court and shall be between 20 years and life imprisonment.

N.J. Stat. Ann. § 2C:43-7(a)(2).

Here, Petitioner was sentenced to nine years for aggravated assault (second degree) and a concurrent term of thirty-five years for robbery (first degree). *See* ECF No. 12-16.  Petitioner argues that the sentence is unconstitutional under *Apprendi*.  In *Apprendi*, the Supreme Court held that, under the Sixth Amendment, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 489.  *Blakely v. Washington* clarified *Apprendi*, holding that a judge-imposed

sentence in the context of a jury trial that increases the penalty beyond the statutory maximum must be based upon facts found by the jury beyond a reasonable doubt. 542 U.S. 296, 303–04 (2004).  Here, however, the sentence did not go beyond the statutory maximum; Petitioner was eligible for an extended term of twenty years to life imprisonment, and only received a sentence of thirty-five years.  In fact, the judge, during the extended term sentencing hearing, articulated that Petitioner would receive a lower sentence because "there is an element of keeping sentences in proportion here between this defendant and the other defendants." ECF No. 12-12 at 18.  While the judge did also assess various aggravating factors, such as the depraved nature of the offense, the risk that Petitioner would commit another offense, his extensive prior criminal record, and the need to deter Petitioner (*see* N.J. Stat. Ann. § 2C:44-1), the sentence was still well-within the prescribed statutory maximum.

Further, the Court finds — as did the Appellate Division when Petitioner raised this claim on direct appeal — that there was sufficient evidence in the record for the judge to apply those specific aggravating factors.  Therefore, given that counsel did object to the extended sentence, and given that the sentence falls within the statutory range under New Jersey law, the Court does not find that counsel was deficient under *Strickland* in failing to object to the sentence.[3]  Further, Petitioner has not shown to a reasonable probability that the judge would have shortened the sentence, had counsel raised further objections.  As such, this claim for habeas relief is denied.

---

[3] Petitioner also appears to argue that the judge considered his juvenile record in imposing an extended-term sentence.  The record reveals that during the extended-term sentencing hearing, the State specifically differentiated between Petitioner's juvenile and adult record, indicating there was enough in his adult record to make him eligible for an extended-term. ECF No. 12-12 at 6–7.  The only time the judge mentioned his juvenile record was when referencing aggravating sentencing factor number three, the risk that Petitioner would commit another offense, which has no bearing on whether Petitioner qualified for an extended sentence under N.J. Stat. Ann. § 2C:43-7(a)(2).

### D. Ground Four: *Brady* claim

In Petitioner's final claim for habeas relief, he argues that his trial and appellate counsel were deficient in failing to challenge the State's violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Similar to his first argument, Petitioner appears to allege that the Paterson Police Department tampered with evidence by returning $60.00 to the victim, but because they never turned over a copy of the detective's supplemental notes (referenced in ground one), Petitioner never had an opportunity to discredit the officers about their misconduct. *See* ECF No. 13 at 15–17. Once again, this claim was not raised below, but the Court finds the claim meritless and dismisses it on the merits under 28 U.S.C. § 2254(b)(2).

Under *Brady*, the State bears an "affirmative duty to disclose [material] evidence favorable to a defendant." *Kyles v. Whitley*, 514 U.S. 419, 432 (1995) (citing *Brady*, 373 U.S. 83.) "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). In *Strickler v. Greene*, the Supreme Court clarified that "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." 527 U.S. 263, 281–82 (1999).

Petitioner has failed to show that he was prejudiced by his counsel's failure to raise a claim under *Brady* regarding the State's failure to turn over the detective's supplemental notes. As a preliminary matter, the Court is not convinced that the State committed a *Brady* violation. Petitioner points to what he claims are a detective's supplemental notes, discussed in ground one, above, which state that "[t]he victim was given $60.00 in cash from the amount recovered from

Mr. Primus. The additional $11.00 was tagged under property tag #31365." ECF No. 13 at 21. A true *Brady* violation, however, requires, among other things, that the evidence be favorable to the accused and that prejudice ensue from the failure to turn over the evidence. Here, it is not evident to the Court how the notes would have been favorable to Petitioner, nor how failure to turn over the notes resulted in prejudice to Petitioner.[4] Additionally, Petitioner has not demonstrated that he was prejudiced by his counsel's failure to raise a *Brady* claim, as required under the second prong of *Strickland*. Petitioner has provided no evidence that there is a reasonable probability that the outcome of his case would have been different had the detective's supplemental notes been provided to the defense. The notes merely indicate that money was returned to the victim; the Court cannot perceive how such evidence would have helped Petitioner's case. Insofar as Petitioner has failed to demonstrate a violation under *Strickland*, the Court denies habeas relief on this claim.

## IV.    **CERTIFICATE OF APPEALABILITY**

Under 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because jurists of reason would not disagree with this Court's conclusion that Petitioner has failed

---

[4] Petitioner has also failed to explain when he ultimately received the detective's supplemental notes. He appears to state that they were never handed over to the defense, yet he attaches them to the instant Petition. The Court will presume the notes were provided to Petitioner at some point after the conclusion of his trial.

to make a substantial showing of the denial of a constitutional right, Petitioner's habeas petition is inadequate to deserve encouragement to proceed further.  As such, a certificate of appealability is denied.

## V.     <u>CONCLUSION</u>

For the reasons stated above, Petitioner's Amended Petition for habeas relief is **DENIED** and Petitioner is **DENIED** a certificate of appealability.  An appropriate order follows.


Dated: March 15, 2021                                                 _____

**CLAIRE C. CECCHI, U.S.D.J.**